## AFFIDAVIT

I, Andreas McKee, Special Agent with Homeland Security Investigations (HSI) being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.  I am a Special Agent with the HSI, and have been since 2009.  I am currently assigned to HSI Denver, and specifically to the Smuggling, Gangs and Public Safety Group.  I investigate money laundering and drug trafficking in the normal course of my duties, and I am fully familiar with the facts of the case.  During the course of my career, I have been involved in investigations involving the internet, cellular telephones, and email, and I am familiar with social media networks.  I also have investigated and charged individuals in cases involving the possession of firearms by prohibited persons.

2.  This affidavit is submitted in support of an application related to the search of cellular phones, computers, and data storage devices (also referred to as electronic devices) in the custody of HSI. These electronic devices were found during the execution of a federal search warrant on May 21, 2019.

3.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 are present within the electronic devices described in Attachment AA.

4.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.  These electronic devices are described more fully in Attachment A and below.  Based on the facts below in this affidavit, I submit there is probable cause to believe the electronic devices seized from 4944 and 4946 Morrison Road contain evidence, fruits, and instrumentalities of the distribution of illegal substances in violation of 21 U.S.C. § 841 and a conspiracy to do the same in violation of 21 U.S.C. § 846. Thus, I seek permission to search the items listed in Attachment A for the items described with particularity in Attachment B.

6.  The Electronic Devices to be searched are as follows:

    A.  HP All in One computer, serial number 4CS22407PZ

    B.  Apple iPad, serial number GCGVN6DKHLJJ

    C.  Apple iPhone, IMEI 990002800672196

    D.  Apple iPhone , IMEI 990002238400129

    E.  Galaxy Note 4, serial number RF8FB01EMLE

    F.  Apple iPhone, ICC 579CE3092A

    G.  Apple iPhone, IMEI 013847005902670

    H.  Samsung Smart Watch

    I.  Western Digital external hard drive, serial number WXL1AC030879

    J.  Two 8 GB thumb drives

    K.  Fuji Film 16 MB XD card

    L.  Kmoon DVR (from surveillance system)

which were seized during a lawfully executed search warrant on 4944 and 4946 Morrison Road, the businesses used by Domingo Martinez at the time of his arrest on May 21, 2019.

## PROBABLE CAUSE

*Information Indicating the Subject Premises was Being Used for Drug Trafficking*

7.  In January 2018, the Denver Police Department (DPD) received information that Domingo MARTINEZ was involved in the smuggling of methamphetamine from Mexico. In December 2018, DPD received additional information that MARTINEZ was transporting methamphetamine from Colorado to Nebraska. Surveillance conducted by DPD of 4944 and 4946 Morrison Road in Denver, Colorado (hereinafter referred to as the SUBJECT PREMISES) in December 2018 observed a black Jeep Cherokee with Nebraska license plate 48D203. Nebraska Department of Motor Vehicle (DMV) records list this vehicle as a 2004 black Jeep with a registered owner of Domingo Martinez at 1202 West 10th Street, McCook, Nebraska.

8.  In February 2019, the DPD Mid-level Narcotics team sent a DPD Confidential Informant (CI) into the SUBJECT PREMISES. The CI met with a Hispanic male in the business that was later identified by photograph as MARTINEZ. The CI spoke to MARTINEZ about the sale of methamphetamine. MARTINEZ told the CI that he only sells pounds of methamphetamine and nothing less. During the conversation, MARTINEZ showed the CI a handgun and they discussed a deal for the future.

9.  The CI has worked with DPD as well as with other law enforcement agencies for over 15 years and is consistently reliable. The CI does not have any felony convictions, narcotics convictions or convictions relating to dishonesty. The CI is not known to be a narcotics user or dealer and is paid as an informant.

10. The SUBJECT PREMISES is located at 4944 and 4946 Morrison Road in Denver, Colorado. City of Denver property records show that there are multiple units (4940 through 4946) located on the triangular parcel of land with schedule number 05183-08-0001-000. This property is owned by John Grimes at 5415 Hoyt Drive in Arvada, Colorado. Units 4944 and 4946 are in the same building and the only units visible from Morrison Road in the building. Colorado Secretary of State records show that 4944 Morrison Road is Chach Auto Repair and Body, with the registered agent being Domingo Martinez at 5012 East 127th Way in Thornton, Colorado. Colorado Secretary of State records show that 4946 Morrison Road is Chinos Barbers Shop LLC, with the registered agent being Triumph Business Services LLC at 1776 South Jackson Street, Suite 110 in Denver, Colorado; and the person forming the limited liability company (LLC) as Sergio Robles Olivas at 3330 West Arkansas Avenue in Denver, Colorado.

*Identification and Background of Domingo MARTINEZ Jr.*

11. Domingo MARTINEZ Jr., DOB: xx/xx/1979, holds CO DL # xxxxx0509 at 5012 East 127th Way, Thornton, Colorado; with a business address of 4944 Morison Road, Denver, Colorado. A search of

criminal history records indicated MARTINEZ had been arrested in Colorado and Nebraska for prohibited use of a weapon, probation violation, amphetamine possession, attempted homicide, and driving under the influence. In 1995, MARTINEZ was sentenced to 6 years in the Youthful Offender System for 1st Degree Assault; and in 2006, MARTINEZ was sentenced to 8 years in the Colorado Department of Corrections for Possession of a Schedule II controlled substance and possession of a deadly weapon.

*March 22, 2019 Controlled Purchase at the SUBJECT PREMISES*

12. On March 22, 2019, at approximately 12:00 pm, detectives of the DPD Mid-level Narcotics Team along with members of HSI met with the CI for the purpose of purchasing a pound of methamphetamine from MARTINEZ. The purchase was to take place at the SUBJECT PREMISES. The CI was searched for contraband which proved negative. The CI was driven by an HSI undercover agent (UCA) to the SUBJECT PREMISES. The UCA maintained $3,000 for the potential purchase.

13. At approximately 12:45 pm, the CI and UCA parked on Morrison Road in front of SUBJECT PREMISES. The CI then entered and exited the business through the doors under the barber shop sign (4946 Morrison Road). The CI returned to the UCA who drove the CI back to the pre-arranged meet location. The CI related that he/she met with an unknown male who the CI believed was MARTINEZ's brother. The unknown male told the CI that MARTINEZ was not there. The unknown male then made a telephone call and told the CI to return in an hour and a half.

14. At approximately 2:31 pm, the CI and UCA parked on Morrison Road in front of SUBJECT PREMISES. The CI exited the vehicle and spoke with MARTINEZ in front of the SUBJECT PREMISES while MARTINEZ was working on a vehicle with its rear tire off. The CI returned to the vehicle driven by the UCA. The UCA drove the CI back to the pre-determined meet location. The CI related that he/she met with MARTINEZ who told the CI that his business location was "hot" right now and he does not keep anything there, and that he (MARTINEZ) would have to make a telephone call to have someone bring the methamphetamine. MARTINEZ told the CI to come back in one hour. A video and audio recording device on the CI recorded the CI and MARTINEZ negotiating the deal. The conversation was in Spanish. The transcription of a portion of the conversation is:

MARTINEZ: How many you want?
CI: Well, what we agreed. Are you going to give it to me at three bucks?
MARTINEZ: So, just one pound?
CI: Yeah, just one. But make sure it is good, dude. Because once I (telephone rings) You know what I mean? Otherwise it won't be worth it.

15. At approximately 4:06 pm, the CI and the UCA returned to the SUBJECT PREMISES and parked in front of the business. The CI entered the business through the Chino's Barber Shop entrance. A video recording device on the CI showed the CI entering the garage area through the barber shop and MARTINEZ meeting the CI there. The CI was shown a clear bag containing a crystalline substance, the suspected methamphetamine. The area where the CI was shown the suspected methamphetamine is later identified as room C in the search warrant sketch from the when the electronic devices were seized. The CI exited the SUBJECT PREMISES through the barber shop doors, returned to the vehicle and was given the $3,000 by the UCA. The CI reentered the SUBJECT PREMISES through the garage doors, MARTINEZ's face is seen again, then the CI exited the SUBJECT PREMISES and returned to the vehicle with the UCA. The UCA took custody of the suspected methamphetamine. The CI and the UCA drove back to the pre-determined meet location at which time the CI was searched for contraband which proved negative.

16. The suspected methamphetamine tested positive for the presence of methamphetamine with a presumptive test. The suspected methamphetamine was logged into HSI evidence and shipped to the Drug Enforcement Administration (DEA) Western Laboratory for purity testing. The testing found the net weight to be 447.8 grams +/- .2 grams, and the substance purity to be 99% +/- 4%.



*(Methamphetamine purchased from MARTINEZ after he made a telephone call requesting it.)*

*May 8, 2019 Meeting between CI and MARTINEZ at the SUBJECT PREMISES*

17. On May 8, 2019, the CI met with MARTINEZ under the instruction and observation of the DPD Mid-level Narcotics Team. At approximately 3:05 pm, the CI walked up to the front of Chino's Barber Shop. A black Dodge Ram with Colorado license plate OTE573 had just pulled into the parking lot. Two males exited the truck and met the CI. One of the males was MARTINEZ. All three males walked into the barbershop entrance. Approximately five minutes later, the CI exited the barber shop and returned to his/her vehicle and departed the area to a pre-determined meet location. The CI related that he/she met with MARTINEZ and MARTINEZ joked with the CI about not coming around for six months. The CI told MARTINEZ that he was getting some (methamphetamine) for a cheaper price. During the conversation, the CI asked if he/she could get a better deal if he/she bought three pounds. MARTINEZ told the CI if he/she bought 10 pounds, he (MARTINEZ) would sell it for $2,600. The CI agreed to purchase four pounds the next Wednesday. MARTINEZ told the CI to come back on Tuesday to talk about the deal. The CI was wearing a video and audio recording device during this meeting. During the meeting, MARTINEZ can be seen looking equally at the CI and at a monitor on the wall with images from the surveillance cameras. The recordings have not been transcribed and translated at this time. The area where this meeting occurred is later identified as room B in the search warrant sketch from the when the electronic devices were seized.

*Search Warrant for SUBJECT PREMISES and Arrest Warrant for Domingo MARTINEZ*

18. On May 10, 2019, the Honorable S. Kato Crews, U.S. Magistrate Judge for the District of Colorado, signed a search warrant for 4944 and 4946 Morrison Road in Denver, Colorado (19-sw-5511-SKC); and an arrest warrant for Domingo MARTINEZ Jr. (19-mj-00119-SKC).  The search warrant commanded that it be executed on or before May 24, 2019.

19. Law enforcement set up an operation to execute the search warrant on the SUBJECT PREMISES on May 15, 2019. However, based on the circumstances described below, that date shifted to May 21, 2019.

*Additional CI contact with MARTINEZ*

20. On May 14, 2019, DPD was unable to locate the CI.  The planned meeting between the CI and MARTINEZ did not occur.  The CI was located later that evening.

21. On May 15, the CI went to the business under the instruction and observation of the DPD Mid-level Narcotics Team.  The person in the barbershop told the CI that Martinez was not there and that they were unable to reach him.

22. On the evening of May 17, 2019, the CI went to the business on his/her own without the supervision of DPD and contacted Martinez.  After the meeting, the CI told DPD that he/she told Martinez that Martinez not being there on Wednesday caused him/her problems with his/her buyers.  Martinez told the CI that he could do the deal on Tuesday (May 21, 2019).

*May 20 Meeting between CI and MARTINEZ at the SUBJECT PREMISES*

23. On May 20, 2019, the CI went to the SUBJECT PREMISES and spoke with MARTINEZ under the instruction of DPD.  The CI relayed that MARTINEZ confirmed that the deal was still on for the next day.  The CI again tried to get a lower price.  MARTINEZ told the CI that he usually deals in ten pounds or more and that if the CI wanted a better deal, the CI would need to purchase ten pounds.  They agreed to do a four-pound deal at $3,500 a pound at 11:00 am the next day.  This meeting was recorded; but has not been transcribed and translated at this time.

*May 21 Meeting between CI and MARTINEZ at SUBJECT PPREMISES*

24. On the morning of May 21, 2019, the CI went to the SUBJECT PREMISES and met with MARTINEZ.  They spoke about the deal that day.  MARTINEZ made a telephone call on a cellular telephone; this conversation was not heard by the CI.  When MARTINEZ completed the telephone call, he told the CI that it would be about an hour (indicating that that is when the methamphetamine would arrive).  This meeting was recorded; but has not been transcribed and translated.  During this meeting, a video recording device on the CI recorded MARTINEZ sitting in a chair using a cellular telephone below a wall mounted monitor.  The screen on the monitor went between showing "Kmoon" and showing images from multiple surveillance cameras.  The area where this meeting occurred is later identified as room B in the search warrant sketch from the when the electronic devices were seized.

25. The CI returned to the SUBJECT PREMISES around 11:50 am and met with MARTINEZ again.  MARTINEZ told the CI to follow him (in his car) to get it (the methamphetamine).  The CI followed MARTINEZ's car away from the SUBJECT PREMISES, then was told to park and wait on the side of the road.

26. At approximately 12:15 pm, a gold Chrysler 300 parked in front of SUBJECT PREMISES on Morrison Road.  At approximately 12:21 pm, MARTINEZ returned to the SUBJECT PREMISES. The CI was still on the side of the road and was not told by MARTINEZ to return.  Three females exited the Chrysler 300, one took a bag out of the trunk, then they all went into the SUBJECT PREMISES.  One of the females was recognized by DPD as the wife of MARTINEZ.

27. At approximately 12:33 pm, a black Jeep Commander with a possible Colorado license plate of 532OSK, paused on Morrison Road, then pulled in front of the SUBJECT PREMISES on the south end.   At the same time, a gold Lexus pulled in front of the SUBJECT PREMISES on the north end.  The license plate of the Lexus was not visible.  The driver of the Jeep Commander met with MARTINEZ in parking lot in front of the SUBJECT PREMISES.

28. It was believed that the methamphetamine was at the SUBJECT PREMISES at this time and SWAT was given instructions to execute the search warrant entry.

29. A person that appeared to be MARTINEZ walked up to the Lexus and remained there for a minute.  The Driver of the Jeep Commander walked up to a garage door and waited there until MARTINEZ joined him.  The driver of the Jeep Commander returned to his vehicle, both the Lexus and the Jeep Commander departed north bound on Morrison Road, immediately followed by MARTINEZ in his Jeep Cherokee.

30. SWAT arrived at the SUBJECT PREMISES and made entry.

*Arrest of MARTINEZ on May 21, 2019*

31. DPD officers stopped MARTINEZ in his Jeep Cherokee a few blocks north of the SUBJECT PREMISES on Morrison Road.  DPD officers verified MARTINEZ's identification and took him into custody on the federal arrest warrant.  The three females from the Chrysler 300 were in the Jeep Cherokee that MARTINEZ was driving; all were released.  A DPD canine indicated on the Jeep Cherokee for the presence of narcotics, but the search of it was negative.

32. A marked DPD patrol car and an unmarked HSI vehicle with emergency lights activated stopped behind the Jeep Commander when it was stopped in traffic with a taxi cab in front of it at Morrison Road and Alameda Avenue.  An HSI special agent and a DPD Detective approached the Jeep Commander on both sides of the vehicle with badges visible.  The HSI special agent got to the driver's window, made eye contact with the driver and said he was the police, and to turn the vehicle off.  The driver then pulled out of traffic and sped off.  Law enforcement vehicles followed it but were unable to make a stop.

*Results of the execution of the Search Warrant at SUBJECT PREMISES*

33. After SWAT secured the scene, HSI and DPD conducted the search of the SUBJECT PREMISES.  The only person present at the time that SWAT entered was the barber, who was identified as Sergio Robles.

34. Officers and agents located a Benelli semi-automatic 3-inch magnum shotgun in one garage bay.  In another bay, in an area identified on the search warrant sketch as Room C, a vehicle was being prepared to be painted.  The vehicle was stripped, it did not have any interior seats or any windows and was painted with primer.  Inside this vehicle officers and agents located a .38 special revolver, a 9 mm semi-automatic pistol, and .38 caliber and 9 mm ammunition rounds.  Additionally, there were drug test kits, a hide-a-can (a beverage can with a compartment in it to hide narcotics), and several digital scales with a powdery residue.

35. All of The Electronic Devices seized during the search warrant were located in the area identified as Room B in the search warrant sketch.  This is an office like space and the location were the CI discussed the details of the planned purchase of methamphetamine with MARTINEZ.

36. Additionally, in the file cabinet in Room B, officers and agents located 79 small plastic baggies consistent with the size that would be used for distribution of small amounts of narcotics.  The baggies were in a drawer next to a digital scale (with a white residue on it), the two Hooked 8 GB thumb drives, and the Fuji Film 16 MB XD card.  Also in the file cabinet, were seventeen 9 mm ammunition rounds and three .223 caliber rifle ammunition rounds.

37. Room B also contained a Kmoon surveillance system digital video recorder that displayed its feed from multiple cameras inside and outside of the building on a monitor on the wall.  One of the surveillance cameras filmed Room B.

*Modus Operandi of Drug Trafficking Organizations and Traffickers*

38. I have experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and the detection and documentation of proceeds from drug trafficking.  I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations.  Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

39. I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

   a.    That a significant percentage of methamphetamine imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States, and is then transported to various cities throughout the United States for retail distribution. Furthermore, I know that the importation, transportation, and distribution of methamphetamine, heroin and cocaine are controlled by a number of well-organized and sophisticated drug trafficking organizations. I also know that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of distribution in the United States back to Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

   b.    That members of these organizations routinely utilize communication facilities including cellular telephones calls, electronic text messaging, and messaging applications accessible on cellular telephones, to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection. Based on training and experience, I know that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

c.      That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

d.      That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, computers, and removable storage media. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

e.      That narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.  Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

f.      That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, cashier's checks, money orders, wire transfers, and the like.  Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers.  I further know that narcotics traffickers often store electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones.  My colleagues and I have seen, for instance, photographs of money orders, tracking numbers, and cash.

g.      That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles. I further know that narcotics traffickers often store electronic copies of records and receipts to such travel on digital devices such as cell phones.  Similarly, geolocation information stored on devices also may reveal travel and patterns of travel material to the distribution of the controlled substances to obtain and redistribute.

h.      That drug traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product; and that these traffickers often maintain these electronic images stored on digital devices such as cell phones.  One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

i.      That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store digital versions of such

documents in electronic devices such as cell phones.  My colleagues and I are also aware that more and more commonly such records exist only in electronic form as people more generally move from paper to electronic records to conduct the daily affairs of their life.

j.  There are many reasons why drug traffickers maintain digital evidence for long periods of time. The evidence may be innocuous at first glance (e.g., electronic versions of financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, records relating to safe deposit boxes, and computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence on a digital device or may believe law enforcement could not obtain a search warrant to search the device and seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any evidence stored on a digital device. However, that evidence may still be retrievable by a trained forensic computer expert.

k.  That drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

l.  Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects:  (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41, Fed.R.Crim.P., permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

40. Based on training and experience, your affiant knows that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.

41. Cellular telephones often have a subscriber identity module or subscriber identification module (SIM), which is an integrated circuit that securely stores the International Mobile Subscriber Identity (IMSI) and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number (ICCID), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and

certain passwords. Most SIM cards will also store certain usage data, such as call history, text (SMS) messages, and phone book contacts.

42. Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

43. Based on training and experience, your affiant knows that digital storage devices, to include cellular phones, can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

44. Based on training and experience, your affiant knows that examining data stored on digital storage devices, to include cellular phones, can uncover, among other things, evidence that reveals or suggests who possessed or used the digital storage device.

45. Your affiant respectfully asserts there is probable cause to believe that things that were once stored on the electronic devices may still be stored there, for at least the following reasons:

a.  Based on training and experience, your affiant knows that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Deleted files or remnants of deleted files, therefore, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, hard drives of digital storage devices can contain electronic evidence relating to the manner of the devices' use and the identities of users of the device. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence; specialized software is typically required for that task. It is, however, technically possible for a user to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by

whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

46. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on The Electronic Devices that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence on The Electronic Devices that establishes how The Electronic Devices were used, the purpose of the use, the identities of those who used The Electronic Devices, and when The Electronic Devices were used. There is probable cause to believe that this forensic electronic evidence might be on The Electronic Devices because:

   a.   Data on the devices can provide evidence of a file that was once on the storage device but has since been deleted or edited. Virtual memory paging systems can leave traces of information on the device that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months after they have been downloaded onto the device, viewed, or deleted.

   b.   Forensic evidence on a device can also indicate the identities of individuals who have used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.   A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, when the devices were used, and the identities of the individuals who used them.

   d.   The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device constitutes evidence of a crime may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information is necessary to understand other evidence which also falls within the scope of the warrant.

   e.   Your affiant knows that when an individual uses an electronic device in furtherance of criminal activity, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium which contains evidence of the crime. The electronic device is an instrumentality of the crime because it is used to facilitate the commission of a criminal offense. Based on training and experience, I know that the electronic device is also likely to be a storage medium for evidence of crime. For example, an electronic device used in furtherance of drug trafficking may contain images of narcotics, proceeds of narcotics sales, and images and contact numbers of co-conspirators who are involved in narcotics distribution.

   f.   Based on training and experience, your affiant understands that persons committing or planning to commit crime often use their cellular device in the area of criminal activity before, during, and

after the alleged crime. Suspects may use the Internet or other electronic map applications to conduct map reconnaissance of locations associated with their criminal activity, in an effort to plan approach and escape routes.

g.  Based on training and experience, your affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine the true content of the file.

47. *Need to review evidence over time and to maintain the entirety of the evidence*. Your affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. For the following reasons, your affiant respectfully asserts that it would be impractical and infeasible for the government to review the mirrored images of digital devices, which are copied as a result of a search warrant issued pursuant to this Application, during a single analysis:

a.  Your affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this nature often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole. Forensic analysis is context-dependent, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in relation to other pieces of data.

b.  Your affiant has reviewed activity and data from digital devices in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews are necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain a full picture and complete meaning of the data from the information sought in Attachments A and B of this application, the government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.

c.  As with all evidence, the government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

d.  Because this evidence already seized as a result of a search warrant and is in the custody of HSI, your affiant requests that this warrant be executed at any time.

48. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your applicant is applying would permit seizing, imaging, copying, and reviewing the contents of The Electronic Devices in Attachment A consistent with the terms of the warrant. The warrant for which your

affiant is applying would authorize a later examination and perhaps repeated review of the data found on The Electronic Devices or information from a copy of The Electronic Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, which might expose many parts of The Electronic Devices to human inspection in order to determine whether it is evidence described by the warrant.

*Conclusion*

49. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of 21 U.S.C. §§ 841(a)(1) and 846 may be located within the electronic devices described in Attachment A.

50. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

*s/Andreas McKee*
Andreas McKee, Special Agent
Homeland Security Investigations

SUBSCRIBED and SWORN by reliable electronic means this 29th ~~23rd~~ day of May 2019.

*Michael E. Hegarty*

HON. MICHAEL HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**This application for a search warrant was reviewed and is submitted by Justin DeRosa, Assistant United States Attorney.**

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

The electronic devices to be searched is as follows:

A.  HP All in One computer, serial number 4CS22407PZ



B.  Apple iPad, serial number GCGVN6DKHLJJ



C.  Apple iPhone, IMEI 990002800672196



D.  Apple iPhone , IMEI 990002238400129



E.  Galaxy Note 4, serial number RF8FB01EMLE



F.  Apple iPhone, ICC 579CE3092A



G.  Apple iPhone, IMEI 013847005902670



H.  Samsung Smart Watch



I.    Western Digital external hard drive, serial number WXL1AC030879



J.    Two Hooked 8 GB thumb drives



K.   Fuji Film 16 MB XD card



L.   Kmoon DVR (from surveillance system)



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

Evidence of a crime; contraband, fruits of crime, and other items illegally possessed; or property designed for use, intended for use, or used in committing crimes, namely violations of 21 U.S.C. §§ 841 (possession with intent to distribute and distribution of a controlled substances) and 846 (conspiracy to distribute a controlled substance), and particularly the following:

1. The assigned telephone numbers of the cellular telephones and other identifying information about the devices (ESN, MIN, IMSI, or IMEI);

2. The electronically stored phone books or contact lists;

3. The call logs to include the record of incoming, outgoing, and missed calls;

4. All voice messages recorded on the device that pertain to the identity of the devices owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof;

5. All sent, received, and composed text messages that pertain to the identity of the device owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof; and payment related to controlled substances;

6. All sent, received, and composed email messages that pertain to the identity of the device owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof; and payment related to controlled substances;

7. All stored photographs and videos pertaining to the identity of the device owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof; and payment related to controlled substances;

8. All GPS information stored on the devices and any information to include cell site information or metadata which would indicate the device's past locations related to drug trafficking activity;

9. Internet searches that pertain to the identity of the devices' owner/user; the identity of known and unknown co-conspirators; and controlled substances, including the distribution thereof;

10. All notes stored on the devices that pertain to the identity of the devices' owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof; and payment related to controlled substances; and

11. Social media applications present on the device, including but not limited to Instagram and Facebook, as these applications may contain GPS data and location information indicating where the phone has been used, as well as photographs, videos, and messages concerning the identity of the device owner/user; the identity of known and unknown co-conspirators; and discussions pertaining to controlled substances, including the distribution thereof; and payment related to controlled substances.